J-S30014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| A.P., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| S.P., | |
| Appellee | No. 1792 WDA 2017 |

Appeal from the Order Entered November 1, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): FD-14-006270-008

BEFORE: BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 24, 2018**

A.P. ("Father"), appeals from the November 1, 2017 order, which granted S.P.'s ("Mother") request to relocate with the parties' minor children, D.P. and R.P. (collectively "Children"), from Allegheny County, Pennsylvania to Montreal, Canada, and awarded Mother sole legal and primary physical custody of Children, and Father partial physical custody in accordance with a schedule delineated in the order. After careful review, we affirm.

Father and Mother married on July 5, 2006. Their son, D.P., was born in September of 2007, and their daughter, R.P., was born in February of 2011. Mother filed for divorce in February of 2014, and a divorce decree was entered on February 2, 2016. On July 8, 2016, Father filed a complaint seeking full

_____

[*] Retired Senior Judge assigned to the Superior Court.

custody of Children, and the parties have been involved in highly contentious custody litigation ever since.  Trial Court Opinion ("TCO"), 1/24/18, at 2-3.

The trial court further summarized the relevant facts and procedural history as follows:

Father remarried on October 9, 2016.  His wife, Tiffanie (hereinafter "Wife") came to the marriage with a son, currently 13 years old, as well as a young daughter, currently age 4.  Mother, who works as an agricultural specialist for the U[.]S[.] Customs and Border Protection, is in a long term relationship with another customs officer who is currently living in Montreal, Canada.

The parties' son, D.P., is, by all accounts, an easy going child. R.P., however, struggles with anxiety[,] as well as digestive problems[,] which may be related to her anxiety and/or to food allergies or sensitivities.  R.P. has been in counseling for her anxiety and on various diets to relieve her stomach ailments.

While the parties were married, Father was often unemployed and so [he] spent a great deal of time with [Children] while Mother worked.  After separation, the parties made custody arrangements in an *ad hoc* fashion on their own[,] which provided liberal contact between Father and [Children].  Although they did not seek court intervention relating to custody arrangements until Father's filing, there was a great deal of discord between the parties regarding custody.

These difficulties became worse when Mother moved to a different school district and Father became romantically involved with his now Wife. It is Father's position that Mother was attempting to unfairly limit his time with [Children].  Mother, for her part, describes the problems as a result of Wife['s] manipulating Father's behavior regarding [Children].  Whatever the cause, the parties' difficulties escalated.  The parties were proceeding to a custody trial.  Psychological evaluations were ordered and the parties first met with Dr. Rosenblum of Allegheny Forensic Associates in October of 2016, soon after Father's marriage to Wife.

The custody situation ultimately deteriorated after [Children] returned from Father's and told Mother of an incident which occurred on or about January 22, 2017.  According to

Mother, when preparing R.P. for bed, she found a scratch on her vaginal area. R.P. claimed not to know how it occurred. Two days later, R.P. claimed not to want to go to Father's because her stepbrother was mean to her. Mother questioned R.P. further the next day and R.P. disclosed she had been inappropriately touched by her [stepbrother]. Mother took R.P. to her school counselor, Emily Hoffman, where R.P. disclosed the incident to [Ms.] Hoffman. CYF was notified and R.P. was then interviewed by the agency. R.P. did not disclose to CYF[,] and the agency determined the report to be unfounded.

Mother petitioned to suspend Father's custody. Father and Wife[] vehemently denied the allegations, stating that, on the date in question, R.P. had never been alone with her [stepbrother] and that the incident could not have occurred. [The court] entered an order on February 14, 2017[,] suspending Father's custody. On March 15, 2017, [the court] entered an order providing Father with a 4-6 hour period of partial custody of [] [C]hildren to be exercised weekly "in the community (not at the home)" without the presence of Wife or the [stepbrother]. The court was also informed that Wife's older son, the [stepbrother] against whom R.P. made allegations, himself suffered sexual abuse years previously. This information had not been disclosed during the psychological evaluations.

[The court] ordered the parties to return to Dr. Rosenblum so that he could address R.P.'s allegations against the stepbrother, to address the previous abuse of stepbrother and to investigate the nature of the counseling he had been receiving, and to determine why this abuse had not been revealed to Dr. Rosenblum during the initial evaluation. Dr. Rosenblum saw the parties again on April 4, 2017. Dr. Rosenblum testified that R.P. disclosed the alleged abuse during that interview and that he found her fears and concerns to be genuine.

Dr. Rosenblum also testified that in the first evaluation he had not been told by Father and Wife that R.P.'s stepbrother was being treated by a therapist due to being sexually assaulted at a young age. When questioned why this was not mentioned to the evaluator, Father replied[,] "I guess it just never came up."

Dr. Rosenblum then consulted with stepbrother's therapist after being made aware of the previous abuse he had suffered. The stepbrother's therapist revealed that stepbrother's treatment had also included treatment for his resentment of his two new

- 3 -

stepsiblings being in the house. This fact was also never revealed by Father or Wife to Dr. Rosenblum.

R.P. did not disclose the alleged incident to Megan Cook, her therapist. Nonetheless, regardless of the factual truth or untruth of R.P.'s allegations, [Ms.] Cook found that R.P. exhibited behaviors, including fear of returning to Father's home, which were consistent with that of children who have been traumatized by sexual abuse. Father and Wife made clear to all of the professionals involved in R.P.'s treatment that they gave no credence to R.P.'s allegations. In May of 2017, Mother filed [a] petition for contempt, asserting that Father also expressed the disbelief to both children. She also claimed that he continued to take [] [C]hildren to his home during periods of custody, despite [the] court order forbidding that. [The court] found Father in contempt after a hearing on June 19, 2017. [It] further ordered the parties to engage in family therapy and co-parenting therapy and reiterated that Wife and stepbrother were not to be present during the visits.

In February of 2017, at or around the same time that efforts at therapy were to be continuing, Mother bid on a promotion/transfer to Montreal. She was ultimately successful. She sent Father a notice of relocation dated July 14, 2017[,] and he filed a counter affidavit on August 9, 2017. [The court] scheduled a [two-day] trial on the relocation [to begin on] October [16,] 2017.

At trial, [the court] heard testimony from the parties, professionals who treated and/or evaluated the family, and other family members. [The court] also interviewed [] [C]hildren. After consideration of the evidence presented and a review of the custody factors set forth [in] 23 Pa.C.S.[] [§] 5328 and the relocation factors set forth in 23 Pa.C.S.[] [§] 5337(h), [the court] granted Mother's petition to relocate and awarded her sole legal custody. During the school year, Father was provided with one long weekend a month in Allegheny County and custody time should he travel to Montreal. Father was given summer and substantial holiday time. [The court's] order required Father to present a safety plan and to have that plan approved by the professionals involved in the case prior to any overnight custody.

TCO at 3-6 (unnecessary capitalization, citations to record, and footnotes omitted).

On November 30, 2017, Father filed a notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Father presents the following issues for our review:

I.    Did the trial court abuse its discretion and/or err, as a matter of law, in concluding that [Mother] met her burden of proof and was entitled to relocate with the two minor Children from Allegheny County to Montreal, Canada?

II.    Did the trial court abuse its discretion and/or commit an error of law in concluding that … Father's[] alleged failure [] to address properly the allegations regarding the alleged incident of abuse justified allowing Mother to relocate with [] Children to Montreal, Canada[,] in view of the statutory factors set forth in 23 Pa.C.S.[ §] 5337(h)?

III.    Did the trial court abuse its discretion and/or commit an error of law when it concluded that relocation factors no. 7 and 8, pursuant to 23 Pa.C.S.[] § 5337(h), favored Mother when, given the evidence presented at trial, the primary reason for the move was for her to join her paramour who is living in Montreal, Canada, and the move does not offer benefits to [] Children they would not have should they remain in Allegheny County, Pennsylvania?

IV.    Did the trial court abuse its discretion and/or commit an error of law in concluding that Father was not entitled to have [] Children at his residence until the establishment of a "safety plan" insofar as Mother had presented no evidence that there was a need for such safety plan or that [] Children were ever subject to abuse by any member of Father's household?

Father's Brief at 9-10 (unnecessary capitalization omitted).

The relevant scope and standard of review are as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest

- 5 -

in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (quoting *R.M.G., Jr. v.*

*F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009). Moreover,

on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*Id.* (quoting *R.M.G., Jr.*, *supra* at 1237 (internal citations omitted)).

Section 5337(h) of the Child Custody Act (23 Pa.C.S. §§ 5321-5340) prescribes the factors which a court must consider when determining whether to grant a proposed relocation:

**(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h). It is the burden of the party proposing the relocation to establish that the relocation will serve the best interest of the child in accordance with the factors set forth in subsection (h). 23 Pa.C.S. § 5337(i). *See also S.J.S. v. M.J.S.*, 76 A.3d 541, 551 (Pa. Super. 2013).

In addition to the foregoing relocation factors, the trial court must also consider the sixteen custody factors set forth in Section 5328 of the Child

Custody Act,[1] when making a decision on relocation that also involves a

custody decision. *See A.M.S. v. M.R.C.*, 70 A.3d 830, 836 (Pa .Super. 2013).

_____

[1] Section 5328 of the Child Custody Act sets forth the following factors to consider when awarding custody:

> **(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>>
>> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>>
>> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>>
>> (3) The parental duties performed by each party on behalf of the child.
>>
>> (4) The need for stability and continuity in the child's education, family life and community life.
>>
>> (5) The availability of extended family.
>>
>> (6) The child's sibling relationships.
>>
>> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>>
>> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

The trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). ***See also A.V.***, 87 A.3d at 823 (noting that Section 5323(d) applies to cases involving custody and relocation). "In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***Id.*** (internal citation omitted). "A

_____

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with [s]ection 5323(d)." *Id.*

Herein, the trial court concluded that Mother met her burden of proving that the move to Montreal would be in Children's best interest and that their lives would be enhanced by the move. TCO at 11. In its November 1, 2017 order ("Order") granting Mother's petition to relocate, the court listed each of the relocation factors set forth in section 5337(h), as well as each of the custody factors enumerated in section 5328(a), and provided a clear and thorough explanation of how the court decided each factor. Based on our review, the evidence of record supports the trial court's decision to grant Mother's relocation request and to award Mother sole legal custody.

Father argues, however, that Mother failed to meet her burden of proof to justify the proposed relocation and alleges that a number of the trial court's findings regarding the statutory relocation factors are not supported by the record. Father's Brief at 23-25. Father submits that Mother's motives for moving are "primarily personal, and include her animosity towards [him]." *Id.* at 33-34. After careful review of the record, we deem Father's claims to be meritless.

In light of Father's issues, we reproduce the trial court's discussion relating to each of the section 5337(h) relocation factors as found in the Order.[2]

1. Nature, quality, extent of involvement and duration of the child's relationship with party proposing relocation and the non-relocating party, siblings and other significant person.

Although Father has exercised significant custody of [Children] in the past, Mother has been their most recent primary custodian. Nevertheless, Father is an involved and loving Father and has a deep bond with [Children]. Father, however, has made choices which have caused [Children], especially [R.P.], to feel safer in Mother's care and has, additionally, made choices not to address [Children's] anxieties concerning members of his household in a manner which would help strengthen his relationship with [Children] and build trust with Mother. Accordingly, this factor favors Mother.

2. Age, developmental stage, needs of child and the likely impact the relocation will have on child's physical, educational and emotional development with consideration for any special needs.

[Children] are good students and have, for the most part, not demonstrated any special physical or medical needs, although one child does have significant issues with anxiety as well as other problems which have affected her. Mother is more adept at recognizing and addressing this child's needs than Father. It is likely that the impact the relocation will have on [Children's] educational and emotional development will be a positive one. That is not to say that both [p]arents will not have to work to maintain Father as an important figure in [] Children's lives.

3. Feasibility of preserving the relationship between the non-relocating party and child through suitable custody arrangements.

_____

[2] We will not reproduce, here, the portion of the Order containing the trial court's analysis of the section 5328(a) custody factors, as Father does not raise any specific objections in his brief to the court's findings regarding the custody factors.

A move from Pennsylvania to Canada will certainly impact the time that Father and [] Children spend together. The custody provisions of this Order are designed to foster the relationship between Father and [Children]. In addition to Father's physical custody time, he will also be able to keep in contact with [] Children through Skype and liberal phone contact, which will become more meaningful as [] Children grow. Much of the burden of preserving the relationship with his children lies with Father, who has chosen to disbelieve his daughter and negate her expressed fears, resulting in the current custody arrangement, which has put a strain on their relationship already.

4. Child's preference.

In this case, [] Children are close to both of their parents but have both expressed a desire to be with their Mother while maintaining a relationship with their Father.

5. Established patterns of conduct of either party to promulgate or thwart the relationship of child and other party.

The [c]ourt finds that this factor slightly favors Mother[,] as Father, in the past, [has] been disparaging of Mother and involved [Children] in discussions regarding court and custody inappropriately.

6. Whether relocation will enhance the general quality of life for the party seeking relocation including but not limited to financial, emotional or educational benefits.

Mother's quality of life will be enhanced by her relocation as she is doing so for a significant job enhancement as well as to be close to her paramour, who has been a significant and positive part of her life[,] as well as [Children's,] for some time. Mother's new position brings with it a significant salary increase as well as personal and professional growth, which is unavailable to her in the Pittsburgh area.

7. Whether relocation will enhance the general quality of life for the child including but not limited to financial, emotional and educational benefits.

The evidence presented demonstrate[s] that [Children] will be living in a supportive environment with quality educational opportunities.

8. <u>The reasons and motivations of each party for seeking or opposing relocation</u>.

The [c]ourt does not find Mother's desire to relocate or Father's opposition to the move to be motivated by anything but love for [Children].

9. <u>Past and present abuse committed by apart [*sic*] or member of party's household and whether there is a risk of harm to the child</u>.

This factor significantly favors Mother. One of the children has credibly alleged abuse by a member of Father's household. While Father could have voluntarily taken steps to prevent any potential risk of further harm, he has not. Instead, it has required repeated court intervention to protect the child. Furthermore, Father has thwarted attempts to obtain much needed counseling for the affected child, to her detriment.

Order at 2-5. The foregoing findings are well-supported by the evidence of record. Moreover, the trial court made credibility determinations to which we must defer. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). Accordingly, we discern no error of law or abuse of discretion by the trial court in its granting of Mother's request for relocation.

Father specifically objects to the trial court's finding that relocation factors 7 and 8 favor Mother. He insists that Mother's primary reason for relocating to Montreal was to join her paramour and asserts that the move does not offer any benefit to Children that they would not have should they remain in Allegheny County. Father's Brief at 42. Again, we deem Father's argument to be wholly without merit.

In support of its findings in favor of Mother, the trial court opined:

Mother's career was virtually stalled in Pittsburgh. In order to progress, she needed to relocate. She chose to relocate to Montreal, where her long term boyfriend is stationed. Clearly,

- 13 -

part of Mother's choice to move to Montreal was to be closer to him and [the court] was not blind to that, nor did Mother try to hide it. [The court] did not find, as Father claims…, that being near her boyfriend is Mother's "principal reason for requesting relocation." To the contrary, [the court] found Mother to be a pragmatic and ambitious person who would not request this move if it did not also enhance her career and benefit her family financially. Additionally, while mother's paramour has a warm and close relationship with [Children], there was no credible evidence that Mother was attempting to supplant him as [Children's] [f]ather.

Mother's move brings not just career enhancement for Mother, but also a significant increase in salary, a housing stipend, and private school tuition for [Children]. These increased benefits will have both a direct and indirect positive effect on [Children], and will also ensure that Mother has the funds for [Children's] monthly transportation to see Father, a requirement of the Order.

TCO at 11-12. After careful review, we deem the trial court's findings to be well-supported by the record and, thus, we ascertain no abuse of discretion.

Next, Father claims that the trial court erred in concluding that its granting of Mother's request for relocation was justified by Father's failure to properly address the allegations regarding the alleged abuse. Father's Brief at 36. The crux of Father's argument is that no abuse was ever proven. *Id.* at 37-41. As the trial court so aptly stated:

Unfortunately, Father misrepresents [the court's] findings on the sexual abuse of his daughter. At no point did [the court] conclude abuse had occurred. To the contrary, [its] focus was on how R.P.'s anxiety was addressed and whether she was being made to feel safe. Even if R.P.'s claims of abuse are based on a mistake or, indeed, even if they were completely fabricated – making her feel safe and her account respected is important to her well-being.

Father argues at Paragraphs 2 and 8 of his 1925(b) statement that [the court] erred in finding that the Relocation Factors generally, and that Factor 9 regarding abuse in particular,

favor Mother when there was "*no evidence* of any abuse of [Children] on the part of Father or any member of his household, and in view of the fact that vague and inconsistent allegations of abuse by Father's step-son were never substantiated by any investigative authority or entity." (Emphasis added).

Father focuses only on the lack of concrete conclusions which, in this case, can never be made. He ignores the emotional toll taken on R.P. by the alleged abuse as well as his denial of it. Factor 9 favors Mother, not because abuse conclusively occurred but because there is a risk that it did. Father refuses to believe that his six-year-old daughter's statements—which he labels "vague and inconsistent"—are evidence, though not proof, that it may have occurred. Father's refusal to even consider that R.P.'s account could be true is harmful to her and raises a significant risk of future harm.

Despite Father's assertions that he has been vigilant in his care of [Children], he and Wife have made clear to R.P. and her brother, that they do not believe her allegations. They have focused all of their attention on trumpeting their superior parenting, claiming they never left [] [C]hildren out of their sight for a moment, a claim [the court] did not find credible.

Father and Wife have not taken the needed steps to allay daughter's fears and have, instead, demonstrated stubborn blindness to the possibility that something could have happened between the children—even something innocent or misconstrued. They have focused laser attention on the lack of conclusive physical evidence. This lack of evidence does not necessarily mean an event did not occur. No person who testified opined that the allegations were factually accurate—only that R.P. is a credible reporter, [*i.e.*,] that she's not lying.

[Ms.] Hoffman … testified to what R.P. told her privately on January 26, 2017, which she then reported to CYF. That report by [R.P.] substantially comported with what R.P. told Mother. [Ms.] Cook … testified that R.P. exhibited signs typical of a victim of traumatic experience of the type alleged. Ms. Cook also testified that R.P. never disclosed to her over the seven months that she treated her and that she received information on the alleged incident from Mother. Ms. Cook testified that R.P. told her [that her] Father told her not to talk about any incident with her therapist or she would "get in trouble."

- 15 -

[The court] did not infer from this testimony that the event occurred as R.P. described or that she is in danger of further abuse, but [it] did take from it, as did Ms. Cook, that she is fearful. Father and Wife have made it clear that they do not believe her, and she knows this, and so she continues to believe they will not protect her. She, instead, views Mother as her protector.

That R.P.'s fear is legitimate is illustrated by the fact Father has disregarded [o]rders [the court] entered to help R.P. feel protected—such as not taking her to the home where she claims the abuse occurred[,] especially when the alleged abuser was present. Father exercised custody of [Children] in his home, despite the clear wor[d]ing of [the court's] February 14, 2017 [o]rder requiring [his] visits with [Children] take place "in the community (not in the home)." [The court] found Father's testimony that he did not understand this [o]rder or believe it to be in effect to be entirely disingenuous and demonstrative of what [the court] found to be his "cavalier" attitude.

TCO at 7-8 (citations to record omitted).

Father's pattern of discontinuing therapy for R.P. was also a "major concern" for the court. *Id.* at 9.[3] The court went on to explain that the concerns raised by the therapists and other professionals who testified were a major factor in its decision. *Id.* at 10. "Because [the court] saw the lack of nurturing extended to R.P. by Father as highly damaging to her sense of safety

---

[3] The court noted:

R.P.'s therapists and Dr. Neil Rosenblum[,]… who performed the psychological evaluation for the trial[,] testified to this pattern. [Dr. Rosenblum] testified Father discontinued family therapy as well as R.P.'s [c]oping [t]herapy…. He testified that Father was [an] "obstructionist" with therapists and withdrew his consent for R.P.'s treatment to her detriment. Dr. Rosenblum testified to his belief that her therapy should have continued, especially in light of the fact that R.P. had anxiety symptoms even before the alleged incident.

*Id.*

- 16 -

and stability, [it] found that the custody and relocation factors generally favored Mother and, accordingly, made the decision to keep [Children] with Mother, with whom they feel safe." *Id.*

Lastly, Father avers that the trial court erred in finding that Father was not entitled to have Children at his residence until he established a "safety plan," because Mother failed to present evidence that there was a need for such a plan or that Children were ever subject to abuse by any member of Father's household. Father's Brief at 43. In response to Father's assertion, the trial court explained that its requirement of a safety plan was,

> specifically designed to alleviate R.P.'s anxiety, to keep her safe, and to ensure Mother's cooperation. It is important for R.P. to know she is safe and respected in her [f]ather's home.
>
> This requirement is not insurmountable, nor is it onerous. [The court] simply required Father to get approval for whatever he proposes from R.P.'s therapist. At trial, Father himself introduced evidence that he had moved to a one-story house and had put other protections in play to make his daughter feel safe. If those measures are deemed acceptable by the professionals, it is possible that Father has already met this requirement.

TCO at 12 (citations to record omitted).

For the reasons stated above, we affirm the court's November 1, 2017 Order granting Mother's request for relocation and granting her sole legal custody.

Order affirmed.

Judgment Entered.

- 17 -

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date:  7/24/2018